**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**                                    **Criminal Case No.: 1:20-CR-33
(JUDGE KEELEY)**

**TERRELL ANDERSON**,

      **Defendant.**

## REPORT AND RECOMMENDATION RECOMMENDING THAT DEFENDANT TERRELL ANDERSON'S MOTION TO SUPPRESS BE DENIED

Presently pending before the undersigned Magistrate Judge is Defendant's Motion to Suppress Physical Evidence [ECF No. 21], filed on October 9, 2020. By Order dated October 13, 2020, [ECF No. 22], United States District Judge Irene M. Keeley referred the motion to the undersigned for conducting a hearing and entering a report and recommendation as to disposition of the motion.

The undersigned is also in receipt of the Government's Response to Defendant's Motion to Suppress Physical Evidence, filed on October 19, 2020, [ECF No. 25], and the Government's Supplemental Response to Defendant's Motion to Suppress Physical Evidence, filed on April 8, 2021, [ECF No. 37]. The undersigned conducted a hearing on Defendant's motion on January 13, 2021, at which the Court heard witness testimony and accepted exhibits into evidence.

Based on a detailed review of Defendant's Motion, [ECF No. 21], the Government's Response, [ECF No. 25], the Government's Supplemental Response, [ECF No. 37], the exhibits introduced into evidence, and the testimony given by witnesses at said hearing, the undersigned **RECOMMENDS** that Defendant's Motion be **DENIED** in full as set forth herein.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant Terrell Anderson ("Defendant") stands accused in a single-count indictment which a Grand Jury returned against him on August 5, 2020. Defendant is named in the Indictment with the offense of Possession of Child Pornography, in violation of Title 18, United States Code Sections 2252A(a)(5)(B) and 2252A(b)(2), based upon allegations that he knowingly possessed materials that contained videos of child pornography, as defined by Title 18, United States Code, 2256(8)(A).

On morning of January 4, 2020, the Bridgeport Police Department ("BPD") received a 911 call reporting a general disturbance at the Super 8 Motel in Bridgeport, West Virginia. Dispatch relayed this information to officers and stated that the caller's friend, Defendant, was presently banging on the door and she wanted him to leave. Officers Lantz, Turner, and Burgess, and Sergeant Sayers consecutively arrived on scene and discovered the Defendant, who appeared upset, in the parking lot. Officers learned from Defendant that he and Samantha Hoover ("Hoover"), whom he lived with, had gotten separate, side-by-side motel rooms the previous night. Defendant told officers that he was now upset because his belongings, including a pair of shoes he wanted for his upcoming work shift at the shoe store, were locked inside Hoover's vehicle and Hoover would not unlock the car.

Officer Lantz initially interviewed Samantha Hoover in her motel room while other officers stayed with Defendant. She was in the room with a man named Ray Vaughn. Sergeant Sayers entered the motel room. The officers together asked Hoover about the disturbance from her perspective.

Officers coordinated for Hoover to come out from her motel room and open her vehicle, in order for Defendant to get his items. During this exchange, Hoover and Defendant began to argue, and officers separated them.

As Defendant retrieved his items from the car, officers observed the odor of marijuana. Officers asked for Hoover's consent to search her car. Oral consent was given; written consent was also later provided. Officers searched Hoover's car and found a glass smoking device.

Officer Turner soon performed a limited pat down search of Defendant's torso.

Sergeant Sayers was informed by motel staff that a girl was sitting in the breezeway. While other officers performed the search of Hoover's vehicle, he found the girl in the breezeway. The girl told Sayers she had spent the night with Defendant. Sayers directed Lantz to join him in interviewing the juvenile female, later identified as ANH.[1] Sayers and Lantz observed the smell of marijuana and asked ANH about the odor. She immediately surrendered 5.75 grams of marijuana from her bra. She told officers that Defendant had given her the marijuana and his other belongings to hold.

Sayers interviewed ANH more fully in his police vehicle. She also provided a written statement at this time. In the written statement, ANH stated that Defendant "might" sell drugs and that he "flaunts his money."[2]  Officers called ANH's legal custodian to pick her up.

---

[1] For the sake of the privacy of the juvenile (who was fifteen years old on the date in question), and consistent with the policies of the Judicial Conference of the United States, the E-Government Act of 2002, Fed. R. Crim. P. 49.1, and LR Gen P 5.08, the initials "ANH" or "AH" were used in the filings, were used at the motion hearing, and will be used throughout this report and recommendation.

[2] The undersigned would note that while there was testimony regarding the written statement, the written statement was not ultimately provided as an exhibit.

While Sayers began to interview ANH in his vehicle, Lantz approached Defendant who was sitting on the sidewalk outside his motel room near Hoover's vehicle. Lantz observed a lump in Defendant's sock. A search occurred,[3] and Lantz seized a bundle of $3,120 in U.S. currency.

Officer Lantz completed a fuller, mirandized interview of Hoover in his police vehicle. Hoover explained to Lantz the nature of her and Defendant's relationship and told Lantz that Defendant sells marijuana. She explained that Defendant frequently sold drugs to her and her family and had been doing so for the last year. She explained Defendant often stayed at her familial home. Hoover explained she had accompanied Defendant on drives to Morgantown where he purchased larger quantities of marijuana. Hoover stated that she last bought marijuana from Defendant four days prior for a cost of $40.00.

After retrieving the cash and completing these interviews, Defendant was arrested on the charge of Possession with Intent to Distribute Marijuana. Officers told Defendant he was to be charged with both Possession with Intent to Distribute Marijuana and Contributing to the Delinquency of a Minor. Defendant was searched incident to arrest, and his iPhone was retrieved.

On January 6, 2020, Officer Lantz applied for a search warrant for the contents Defendant's iPhone. He included in his affidavit the statements from Hoover and ANH about Defendant's alleged drug trafficking and details about the money seized from Defendant. The aim of the search was to retrieve evidence of drug sales. The search warrant was issued by Harrison County, West Virginia Circuit Court Judge McCarthy the same day.

---

[3] There is no consensus among the parties regarding how the cash was seized. As later described in the summarized testimony, Officer Lantz cannot recall whether Defendant handed him the cash upon being questioned about the bulge in his sock or whether Officer Lantz removed the cash from Defendant's sock. Defendant testified that Officer Lantz lifted his pants and removed the bundle of cash from Defendant's sock.

On January 7, 2020, when officers began searching the iPhone, officers discovered naked photographs of ANH. In a subsequent interview, ANH confirmed that she sent the photographs to Defendant prior to January 4, 2020 when she was age fifteen. Lieutenant Weaver of BPD obtained another search warrant authorizing a further search of the phone for child pornography. On the iPhone, officers found a short video from January 3, 2020 of ANH and Defendant engaged in intercourse at the Super 8 motel. Officers also found masturbation videos and photographs of Defendant's genitals, or "dick pics," exchanged between ANH and Defendant several days before their January 3, 2020 motel stay.

In his Motion to Suppress, Defendant argues that law enforcement did not have reasonable articulable suspicion to detain him or to perform the search of his person. Specifically, Defendant argues his Fourth Amendment rights were violated when officers removed cash from his sock without his consent. Defendant argues that the warrantless arrest was unconstitutional because it was lacking in probable cause. Additionally, Defendant argues that the search warrant violates the Fourth Amendment as it was not supported by probable cause. Defendant argues that the search warrant does not address the reliability of the witnesses (who Defendant argues are inherently untrustworthy). Because the search warrant was based upon the statements of the two witnesses, the cash seized, and no other evidence, Defendant argues that the search warrant for the contents of his iPhone is invalid, and accordingly, Defendant's Motion to Suppress should be granted.

The Government opposes the Defendant's motion. First, the Government argues that the officers were justified in conducting an investigative detention of Defendant. Second, the Government argues there was probable cause to arrest the defendant. The Government argues that this probable cause for arrest justifies any searches the Defendant was subjected to and makes it inevitable that the cash and the iPhone would have eventually been discovered. The Government,

in its Supplemental Response, maintains that there was ample probable cause with or without the cash seized and the doctrine of inevitable discovery applies to the discovery of the cash and the iPhone. Thirdly, the Government argues that the affidavit for the search warrant was not deficient as the reliability of the witnesses was easily inferable and the information articulated in the affidavit was sufficient for a determination of probable cause. Lastly, the Government asserts that the <u>Leon</u> good faith exception would apply to save the warrant even if there was a deficiency. The Government requests Defendant's Motion to Suppress be denied.

## II. QUESTIONS PRESENTED

The issues before the Court are (1) whether there was reasonable articulable suspicion to justify the Defendant's investigative detention and search during the investigative detention; (2) whether there was probable cause for Defendant's arrest, which resulted in the seizure of the iPhone during the search incident to arrest; (3) whether the search warrant authorizing the search of the phone was valid; and (4) whether the <u>Leon</u> good faith exception applies and would salvage the warrant even if the warrant were found to be invalid.

## III. SUMMARY OF TESTIMONY AND OTHER EVIDENCE

During the aforementioned suppression hearing on January 13, 2021, the Court heard sworn testimony from four witnesses:

1. Officer Aaron Lantz, Patrolman First Class of the Bridgeport Police Department and Interdiction Specialist for the Mountaineer Highway Interdiction Team South;

2. Samantha Hoover;

3. Officer Cameron C. Turner of the Bridgeport Police Department,

4. Sergeant Christopher Bart Sayers of the Bridgeport Police Department, and

5. Terrell Anderson, the Defendant.

The Court also received into evidence the following: (1) Government's Exhibit 1, Video from Officer Turner's Cruiser Cam; (2) Government's Exhibit 2, Video from Officer Turner's Cruiser Camera; (3) Government's Exhibit 3, Video from Officer Sayer's Cruiser Camera; (4) Government's Exhibit 4, Harrison County Search Warrant and Affidavit from Officer Lantz; and (5) Government's Exhibit 5, Harrison / Taylor County 911 CAD Incident Report. After the hearing, as requested, the Court also received a thumb drive containing full footage from the cruiser dashboard cameras and the recorded January 4, 2020 911 call.

**A. Testimony of Officer Lantz**

According to the testimony of Officer Lantz ("Lantz") at the suppression hearing,[4] on January 4, 2020, Lantz was driving on I-79 when he received a 911 dispatch over the radio that there was a general disturbance at the Super 8 Motel on Barnett Run Road in Bridgeport, West Virginia. The 911 dispatcher relayed that a man was yelling at the 911 caller and cussing. [9:26:36-9:27:07]. Lantz did not know who initiated the 911 call. [10:09:20-10:09:42]. It was notated on the Computer Aided Dispatch Incident Report, "CAD,"[5] that Defendant was mad that Hoover wouldn't give him a ride home, he was banging on the door, and she wanted Defendant to leave. [10:10:00-10:10:07]. As an Interdiction Specialist, Lantz often works on the designated drug corridor of I-79 investigating interstate drug trafficking. [10:02:35-10:04:01]. Lantz responded to this general disturbance call due to his proximity and in order to assist other officers on the "hot call." [10:04:10-10:04:25].

The call came out at 10:39 a.m., and Lantz arrived on scene at approximately 10:43 a.m. [9:27:34-9:28:25]. Lantz was first to arrive on scene. [9:26:00-9:26:31]. Lantz was in uniform,

---

[4] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the suppression hearing on January 13, 2021, which is located on the section of the Court's intranet site for FTR recordings.

[5] See Government's Exhibit 5, CAD Incident Report. [ECF No. 31-2].

including his service weapon, and he arrived in his marked police vehicle. [10:13:08-10:10:56]. Lantz drove around the Super 8 Motel upon arrival. The motel is small, and the doors to the motel rooms open to the outside sideway and parking lot. [10:04:31-10:05:34].

Lantz arrived at the backside of the motel where he observed Defendant in the parking lot, near a blue sedan, later determined to be the car of Hoover. [10:05:41-10:06:25]. The car was parked in front of the side-by-side motel rooms of Hoover and Defendant. In between the car and the motel rooms is a sidewalk. [10:06:40-10:07:09]. Defendant appeared very upset, agitated and irate; he was talking on his cell phone to an unknown subject. [9:30:00-9:30:10].

Lantz's goal was to deescalate the situation. [9:30:10-9:30-35 and 9:32:01-9:32:20]. Lantz parked in the middle of the parking lot, near Hoover's vehicle. [10:13:59-10:14:01]. Lantz did not read Defendant his rights or ask for permission to talk to Defendant before approaching Defendant and asking him what was going on. [10:15:00-10:15:14]. Defendant responded he was trying to get his belongings out of the car and his friend, the owner of the car, would not come out from her motel room and unlock the car. [9:31:00-9:31:40]. Defendant was yelling and complaining about his property being in Hoover's car. [10:08:05-10:08:33]. Defendant told Lantz he lived with Hoover, but he was from Virginia, and his mom lived nearby in Elkins, West Virginia. [10:19:05-10:19:11]. Hoover had the keys to the car, and Defendant didn't have access to get in. [10:08:33-10:08:45]. Defendant wanted Hoover to come outside and open her car so he could get his property and leave. [10:08:47-10:09:00]. Defendant was also angry that Hoover would not give him a ride anywhere. [10:09:02-10:09:05]. At this time, Hoover was in her motel room adjacent to Defendant's motel room and near the car. [9:31:46-9:32:01].

Lantz testified that Defendant was immediately detained, or not free to leave, until Lantz could investigate what was happening. [10:15:36-10:15:48]. Lantz did not explicitly tell Defendant he was not free to leave. [10:16:01-10:16:22].

Two other officers arrived after approximately three minutes. They were the officers who were originally dispatched. [10:10:22-10:13:38]. They parked behind Lantz's vehicle. [10:13:38-10:13:46]. Lantz directed the other officers to talk with Defendant, while Lantz went to talk with Hoover inside her motel room. [9:32:20-9:32-33, and 10:06:25-10:06:40]. Hoover was unwilling to open the door until she saw that it was a police officer knocking. Lantz believed Hoover was scared. [9:32:34-9:32:55]. Inside the motel room, there was also a man from Arkansas named Ray Vaughn. [9:32:55-9:33:12]. Vaughn was there with Hoover "recreationally," and he was the only other person in the room. [9:33:16-9:33:30].

After Defendant had calmed down, Hoover agreed to come out of her motel room and let Defendant retrieve his belongings from the vehicle. [9:33:34-9:33:45]. Lantz and Hoover supervised to ensure Defendant only removed his property from the vehicle. Defendant retrieved his shoes which he told officers were worth about $400. [9:36:15-9:36:37; 10:20:39-10:20:49]. Hoover and Defendant got into an argument while Defendant was retrieving his items from the car. One of the other officers broke up the argument by physically placing himself between Hoover and Defendant. [10:21:56-10:22:05]. Defendant said to Hoover "I'll see you at the house; this is ridiculous" which Lantz interpreted as threatening because Defendant and Hoover lived together. [9:35:27-9:35:42, and 10:22:40-10:22:51]. Lantz was concerned about retaliation against Hoover for calling 911. [9:34:11-9:34:48]. Lantz did not counsel Hoover on her rights about a protective order. Lantz did not observe anything he believed merited getting a protective order or sending Hoover to an advocacy center for abuse victims. [10:23:17-10:24:01].

9

When the car door was opened for Defendant to retrieve his items, officers, including Lantz, observed a strong odor of marijuana. [9:36:37-9:36:50, and 10:20:55-10:20:58]. This is when Lantz's first learned of any marijuana involvement. [10:20:30-10:20:39]. Lantz was called over by Sayers to help conduct an interview of the juvenile female, ANH, while the other officers conducted a search of Hoover's vehicle. [10:21:10-10:21:45].

Sayers had been notified moments before by motel staff of a juvenile female, later determined to be ANH, in the motel breezeway halfway between the rooms of the motel. Sayers began speaking with ANH, then he called Lantz over to the motel breezeway to assist in questioning. [9:47:51-9:48:05; and 10:24:41-10:25:15]. Lantz observed the strong odor of marijuana. [9:48:06-9:48:10]. Lantz and Sayers asked the ANH about the smell; she immediately pulled a bag containing approximately 5.75 grams of marijuana out of her bra. She later stated that Defendant had given her the marijuana and his backpack and told her to go hide in the breezeway. [9:48:11-9:48:32; 10:25:15-10:25:51; 10:28:50-10:28:54]. ANH stated she had knowledge that he sells marijuana and that this was his marijuana. [9:50:23-9:50:34]. ANH also had with her a large Bluetooth speaker, her backpack, and a second backpack which belonged to Defendant. [9:50:40-9:50:52]. Defendant's ID was later found inside of this second backpack. [9:50:53-9:51:00; 10:29:40-10:29:46].

ANH said she did not want to get in any trouble and said, "don't send me back to the group home." To Lantz, ANH appeared scared, and she wanted to cooperate. [10:25:52-10:26:12]. ANH stated, "cooperation is the best thing." [10:26:17-10:26:21]. Lantz did not charge or arrest ANH for possession of marijuana, nor did he call Child Protective Services. [10:26:21-10:26:38]. Lantz called the ANH's guardian to come pick her up. [10:27:00-10:27:08]. ANH was further interviewed on the scene by Sayer. [9:52:30-33].

On cross-examination, Lantz stated he was never able to verify, by video evidence or corroborating witness, that Defendant delivered the marijuana to ANH. [10:28:54-10:29:08]. Lantz did not perform any tests on the bag of marijuana for evidence, such as fingerprints or DNA, to connect the marijuana to Anderson. [10:30:05-10:30:17]. No drugs were found on Defendant. [10:30:22-10:30:25]. The quantity of marijuana found could be a quantity for personal use or for street-level sales. [10:30:30-10:30:51]. The street value of the marijuana would be over one hundred dollars. [9:48-51-9:50:12]. A regular user of marijuana could smoke that quantity of marijuana over the course of a few days. [10:31:10-10:31:22]. Officer Lantz testified that he had was no prior relationship with ANH as to be able to assess her credibility. [10:27:00-10:27:37]. However, Lantz was of the opinion that ANH's willingness to turn over the marijuana in her possession to officers added to her credibility.  [10:38:02-10:38:26]. Lantz stated that officers likely would not have found the marijuana otherwise. Because of her age as well as her gender, Lantz testified that he likely would not have asked to search ANH himself, and a female officer may not have been presently available to perform a search. [10:38:26-10:39:11].

After speaking with ANH, Lantz walked over to chat with Defendant. [10:31:36-10:32:07 and 10:32:35-10:32:45]. Defendant was sitting on the sidewalk by the motel rooms and near Vaughn. [10:32:16-10:32:30]. Lantz began speaking to Defendant and Vaughn. [9:51:08-9:51:14]. Lantz observed that Defendant's sweatpants were tucked into his sock. Lantz observed a large bulge in Defendant's sock. [9:51-15-9:51:38; 10:32:45-10:32:51]. Lantz asked Defendant: "what's in your sock?" [10:32:52-10:32:54]. Defendant told Lantz it was cash in his sock. [9:51:38-9:51:42 and  10:32:55-10:32:57]. Lantz could not remember whether he removed the cash from Defendant's sock or whether the Defendant removed it and handed it to him. [9:51:48-9:51:52]. The cash totaled approximately $3,120 U.S. currency. [9:51:59-9:52:02]. The denominations were

primarily one-hundred and twenty-dollar bills which indicated to Lantz that Defendant was involved in street-level drug sales. [9:45:05-9:45:26, and 9:52:04-9:52:24].

On cross examination, Lantz recognized that the cash was evidence and possibly indicative of illegal drug sales. [10:33:29-10:33:54]. Lantz knew Defendant had a job at the shoe store, but he did not know how much money Defendant made working there. [10:33:55-10:34:11]. Lantz had no knowledge regarding Defendant's banking or other finances. [10:34:11-10:34:18]. Lantz cited the cash in the affidavit for the search warrant. Lantz believed it to be a significant piece of evidence in support of the search warrant. [10:34:23-10:34:43]. Lantz believed that the cash, after being seized, would have been placed in BPD evidence storage. [10:34:44-10:34:53]. Despite training on using evidence forms to document the chain of custody and how evidence is seized, Lantz did not fill out an evidence form documenting the seizure of cash from the Defendant or the chain of custody after the seizure. [10:34:55-10:35:57].

During the search of Hoover's vehicle, officers recovered a marijuana smoking pipe. [9:36:59-9:37:08]. Hoover later gave written consent for the search of the vehicle. [9:36:50-9:36:59; and 10:24:30-10:24:35].

Next, Hoover willingly submitted to an interview with Lantz. She was mirandized, and the interview took place in Lantz's police cruiser.[6] [9:37:26-9:37:47]. During the interview, Hoover told Lantz that Defendant often stays with her and her family at a residence in Taylor County, and Hoover and Defendant had known each other for about a year. [9:42:25-9:42:50]. Lantz did not ever learn whether Hoover and Defendant were intimate partners. Hoover told Lantz that Defendant comes and goes and does not permanently reside with her. [10:18:44-10:19:00].

---

[6] Government's Exhibit 2, which was played at the hearing, contains a portion of Ms. Hoover's interview The interview was recorded by the video camera inside the backseat of Lantz's police cruiser.

Hoover admitted to smoking marijuana, approximately 1-2 grams each day. [9:42:50-9:43:00]. Hoover stated that Defendant sells the marijuana to her. [9:43:03-9:43:10]. Hoover had bought a half ounce from Defendant a few months prior for $130.00, and she often pays $40.00 to buy a few grams from Defendant. Additionally, Hoover told Lantz that she sometimes accompanies Defendant to Morgantown when he purchases his marijuana. [9:43:16-9:43:43]. Hoover was aware that Defendant may be overcharging her for marijuana. [9:43:50-9:44:04]. Hoover told Lantz she most recently purchased marijuana from the Defendant on New Year's Eve, a few days prior, for $40.00. [9:44:10-9:44:27]. She stated she'd been buying marijuana from the Defendant for approximately one year. [9:44:30-9:44:32]. Hoover told Lantz that Defendant often buys marijuana by the ounce, and she would often buy an eighth or a half of an ounce from him. [9:44:39-9:44:51]. The most Hoover had seen Defendant buy was an ounce of marijuana. [9:44:51-9:45:04].

When asked about the $3,120 retrieved from Defendant, Hoover recognized that some of that money was proceeds from drug sales. [9:45:26-9:45:34]. Hoover told Lantz that Defendant only sells marijuana to certain people, including her family. [9:45:46-9:46:00].

Hoover did not provide to Lantz why she was at the motel, but he believed she was just at the motel "recreationally" with Vaughn. [9:46:19-9:46:29]. Hoover and Defendant had driven to the Super 8 Motel together with ANH who they had picked up in Morgantown. [9:46:32-9:46:55].

The information provided by Hoover to Lantz added to Lantz's belief that Defendant was selling marijuana. [9:47:29-9:47:36]. The marijuana found on the juvenile corroborated Lantz's belief. [9:47:40-9:47:50]. Lantz had no prior relationship or familiarity with Hoover as to support his assessment of her credibility. [10:27:37-10:27:45]. Lantz believed she was a credible source because she lived with Defendant, and Hoover and Defendant were friends. [10:27:45-10:28:08].

Based upon the evidence collected on scene and the interviews conducted, Defendant was informed by Turner that he was under arrest, and he going to be charged with Possession with Intent to Deliver Marijuana. [9:52:51-9:53:15;  9:57:27-9:57:41;  10:37:17-10:37:37].  Lantz believed that, even if officers did not arrest Defendant for Possession with Intent to Deliver, Defendant could have been arrested for the misdemeanor charge of Contributing to the Delinquency of a Minor. [9:53:55-9:54:04; 10:36:50-10:37:16]. Lantz explained his understanding that Defendant cannot be charged with both a felony and misdemeanor on the same criminal complaint, or else Defendant would have been simultaneously charged with the misdemeanor of Contributing to the Delinquency of a Minor. [9:53:17-9:53:36, 10:40:40-10:41:06].

According to Lantz, the basis for probable cause for Contributing to the Delinquency of a Minor was that ANH, a minor, had marijuana and made oral and written statements that the Defendant gave it to her. [10:37:38-10:38:00]. For misdemeanors, officers have discretion as to whether they will arrest the suspect or issue a citation. [10:41:35-10:41:48]. Alternatively, officers can choose not to charge someone even if there is evidence of a misdemeanor, such as in the case of ANH where she possessed marijuana yet was not charged. [10:41:49-10:42:06]. Lantz testified that, in his opinion, the cash would have inevitably been found as part of a search incident to arrest, regardless of which charge Defendant was charged with. [9:54:10-9:54:16].

Lantz testified that Defendant was on the phone for most of the morning of January 4, 2020. [9:54:39-9:54:42]. Officers believed Defendant was talking to his mother. Defendant could not provide police with a home address because he was uncertain of the street address. Defendant told officers he worked at the shoe store at the mall nearby, but because of the proximity, officers did not want him to go there following the incident. Defendant told officers that his mom lived in Elkins, and she would make arrangements to come get him. Officers checked in with him repeated

14

about whether he had secured a ride home. About an hour in, Defendant informed officers that his mother's friend was driving to get him, but Defendant was unsure where the friend was driving from. [9:54:43-9:55:40]. Officers waited, and Defendant's ride never showed up. [9:55:45-9:55-52]. Defendant was not free to leave, according to Lantz, because of the concerns about domestic violence or retaliation against Hoover after the officers left.   [9:56:07-9:56:30]. Additionally, officers were continuing to investigate the initial disturbance call, the marijuana odor and possession, as well as the juvenile and her statements. [9:56:36-9:57:17].

Defendant's cell phone was seized when he was arrested [9:58:09-9:58:11]. Lantz subsequently applied for a search warrant for the phone in order to search for information related to drug-related offenses and distribution. [9:58:18-9:58:29]. Lantz personally typed up the affidavit and submitted the application for a search warrant to Harrison County Circuit Court Judge McCarty who issued the search warrant. [9:59:54-10:00:00]. Lantz met with Judge McCarthy in his Chambers. [10:00:04-10:00:07]. Lantz does not remember having any conversation with Judge McCarthy regarding the search warrant. Judge McCarthy read over the search warrant and signed it. [10:00:12-10:00:19]. Lantz cannot remember if Judge McCarthy put him under oath or if Lantz swore to the search warrant. [10:00:20-10:00:29]. Judge McCarthy authorized the search warrant that was presented by Lantz; Lantz subsequently executed the search warrant and searched Defendant's phone.[7] [9:58:43-9:59:05].

---

[7] See Government's Exhibit 4, Search Warrant. [ECF No. 31-1].

**B. Testimony of Samantha Hoover**

According to the testimony of Samantha Hoover ("Hoover") at the suppression hearing,[8] on the morning of January 4, 2020, she was in a Super 8 motel room with Ray Vaughn. [11:11:03-:11:11:25]. The 911 call was dialed by Vaughn, but Vaughn handed the phone to Hoover to speak to dispatch. [11:11:32-11:11:43]. Vaughn called 911 because Defendant was outside the door screaming because Hoover would not give him a ride and because he wanted in Hoover's car to get his stuff. [11:11:44-11:12:03]. Hoover testified that she did not know why she did not let Defendant into the car that morning. [11:12:04-11:12:15]. She had the key fob with her in the room and the ability to unlock the car from her room. [11:12:16-11:12:25]. Defendant became upset. [11:12:30-11:12:34].

Vaughn called 911 and handed Hoover the phone. Hoover told the 911 dispatcher that Defendant was outside the motel room screaming at her because she wouldn't give him a ride or let him in her car to get his stuff. [11:12:40-11:12:58]. Vaughn was upset and would not let Hoover out of the room. [11:13:00-11:13:10]. Then, the police showed up and knocked on Hoover's motel room door. [11:12:12-11:13:30]. The officer wanted to speak to Hoover because of concerns of domestic violence after Defendant told the officer that he lives with Hoover. [11:13:31-11:13:54]. Hoover testified it was not a domestic dispute, and she was not scared of Defendant. [11:13:55-11:14:02]. However, Vaughn was upset and told Hoover that if he left the motel room, he would beat up the Defendant. [11:14:03-11:14:22]. Due to the concerns over a physical altercation

---

[8] Hoover was provided court-appointed counsel for these proceedings upon the motion of the Defendant and with no objection by the Government. [Case No. 1:21-mc-00002-MJA, ECF No. 1]. Zach Dyer represented Hoover for these proceedings. He stated on the record that he met with Hoover and informed her of her constitutional rights and the possible implications of testifying. Hoover, having considered her constitutional rights, still desired to testify at this hearing. Ms. Hoover was a witness called by the Defendant, however, in order to accommodate the schedules of Mr. Dyer and Ms. Hoover, her testimony was taken out of order with no objection from the Government. [11:02:27-11:03:50; 11:10:38-11:10:46].

between Vaughn and the Defendant, Hoover did not open the motel room door until after an officer arrived. [11:14:23-11:14:27].

Hoover let the officer into her motel room and had a conversation with the officer. [11:15:31-11:15:42]. Hoover testified that she could not remember the name of the officer. [11:15:57-11:16:02]. The officer asked who Defendant was, whether he lived with her, why Hoover wouldn't let Defendant into the car, and what this situation was about. [11:16:05-11:16:24]. Once Defendant calmed down, Hoover went outside and unlocked her car so Defendant could get his items out of the car. [11:15:43-11:15:48, 11:16:25-11:16:37]. Hoover stood under the awning, in front of the motel room, while Defendant got his items out of the car. [11:16:39-11:16:57]. Defendant retrieved his shoes from the car. [11:17:17-11:17:22].

Hoover didn't feel "held" by police, but she was told by officers that she was not allowed to leave until officers figured out what was going on. [11:17:30-11:17:49]. Hoover never heard the police tell Defendant he could not leave. [11:17:50-11:18:02]. At one point, Vaughn sat in Hoover's car because he wanted to leave, but he was told not to leave by officers because they were still asking questions. [11:18:09-11:18:25].

Officers observed the odor of marijuana when Hoover opened the trunk of her car for Defendant to get his items. Officers subsequently asked Hoover for permission to search the car; Hoover gave her consent for officers to search the car. [11:16:58-11:17:13; 11:18:27-11:18:40; and 11:18:41-11:18:55].

Next, an officer took Hoover to the side to ask more questions about why she was at the motel and who she was with. [11:19:09-11:19:26]. Hoover told the officer she was there with her boyfriend, Vaughn. Hoover told that officer that Defendant and Hoover had picked up ANH the night before because ANH had gotten into a fight with her boyfriend and needed a place to stay

17

and that is why Defendant and Hoover got a motel room. Hoover again explained to the officer that Defendant's ride fell through that morning, he wanted a ride from Hoover, Hoover told Defendant she had other plans that day and could not give him a ride, and that is when Defendant became upset. [11:19:27-11:20:17]. Before officers has arrived, Defendant had threatened to break the window of Hoover's car. [11:20:21-11:20:33]. Defendant was upset because he wanted his stuff. [11:20:37-11:20:42]. Hoover was agitated because Defendant had called her right before the motel's check-out time and said he needed a ride. [11:20:43-11:20:51]. Hoover didn't want to give him a ride because she was busy. [11:20:52-11:20:56].

Hoover was not there when Defendant was searched. [11:21:07-11:21:23]. Hoover testified that she believes she was speaking with other officers when Defendant was searched. [11:21:28-11:21:49]. Hoover was able to leave in her personal vehicle after officers had finished asking her questions and after Defendant was in handcuffs and ready to be transported by officers. [11:22:24-11:22:46].

On cross-examination, Hoover again stated she was not present when Defendant was first searched. [11:23:10-11:23:19, and 11:23:51-11:24:13]. She testified that she did overhear one officer ask another if Defendant had already been searched. Defendant said yes. Vaughn said "barely." Then, officers began to do a second search of Defendant, which Hoover did not see, but then the cash was found. [11:23:20-11:23:38]. She clarified she did not see officers search Defendant, but she was in the walkway when an officer pulled the money out of Defendant's sock. [11:23:45-11:23:49, and 11:23:51-11:24:25].

**C. Testimony of Officer Turner**

According to the testimony of Officer Turner ("Turner") at the suppression hearing, on January 4, 2020, Turner was dispatched to respond to a call about a disturbance in progress at the

Super 8 Motel in Bridgeport, West Virginia. [11:27:20-11:27:46, and 11:28:12-11:28:20]. Turner was in the vehicle of Officer Burgess ("Burgess"). Burgess was accompanying and supervising Turner because Turner had just completed his training at the police academy a few weeks prior. [11:27:47-11:27:54; and 11:27:54-11:28:11]. Turner was in uniform, carrying his service firearm, and was driving a marked police vehicle. [12:01:52-12:02:20]. Burgess was likewise dressed, armed, and positioned inside the police vehicle. [12:02:21-12:02:27].

Based on the information given by dispatch, Turner believed he was responding to a situation where an irate male was banging on the motel doors and windows and a female telling him to leave. [11:28:21-11:28:33]. Turner did not listen to the 911 phone call himself; he proceeded to the scene based on what the dispatcher relayed. [11:28:33-11:28:49; 12:05:11-12:05:18]. Burgess's role as Turner's training officer was to guide and supervise Turner while Turner took lead on handling this general disturbance call. [11:29:00-11:29:44].

Lantz was already on scene. [11:27:51-11:27:54]. Lantz had arrived two minutes before Turner and Burgess. [11:28:53-11:28:58]. Turner and Burgess arrived just five to six minutes after the call came out. [11:59:46-12:00:14]. Turner used the vehicle's emergency lights but turned them off as he drove onto the property of the motel. [12:01:59-12:02:09]. When Turner first arrived, he observed that Lantz was talking to the male in between two vehicles in the parking lot. [11:29:46-11:29:57, and 12:00:14-12:00:20]. The vehicles were ten to fifteen feet away from the doors of the motel rooms. [12:00:30-12:00:41]. One of these vehicles was later determined to be the vehicle of Samantha Hoover. [12:00:42-12:00:48].

Turner quickly parked in the parking lot, parallel across three parking spaces. [12:01:31-12:01:59]. Turner and Burgess got out of the vehicle and made contact with Lantz. [12:02:28-12:02:30]. Lantz asked Turner to talk to the male, later determined to be the Defendant, while

Lantz went to speak with the female, Hoover, who was locked inside the motel room. [11:29:57-11:30:06 and 12:04:07-12:04:17].

Turner began speaking with Defendant. [11:30:12-11:30:12]. They were behind Hoover's vehicle, near Lantz's car, in the parking lot at this time. [12:02:55-12:03:33]. Turner recognized that Defendant was visibly upset. [12:04:18-12:04:22]. Defendant was irate; Defendant was waving his arms, yelling, and using profanity. [12:09:08-12:09:24]. With one hand, Defendant was holding his phone up to his ear; with the other hand, he was waving his arm. He was moving around as he was talking. [11:30:53-11:31:15, and 12:09:45-12:09:50]]. Turner testified that he took some time to get Defendant under control. [11:30:26-11:30:49]. Turner determined that Defendant had rented a motel room at the Super 8 the night before. [12:10:50-12:10:59].

Turner wanted to deescalate the situation, calm Defendant down, and figure out what was going on. [11:31:16-11:31:34]. Turner aimed to keep Defendant at the location while officers conducted an investigation of the situation. [12:04:36-12:04:42, 12:11:50-12:12:09]. Defendant asked a few times whether he could move from where he was standing, and Turner told Defendant to stay near him. [12:04:43-12:04:52]. Defendant was detained, or not free to leave, according to Turner, from the moment Lantz made contact with him due to the information relayed by dispatch from the 911 call. [12:04:53-12:05:11].

Turner asked Defendant for identification. Defendant was unable to provide an ID card, but he cooperated and provided to Turner his name and date of birth. [11:31:59-11:32:11, and 12:06:45-12:07:00; 12:21:55-12:21:58]. Turner made no attempt to physically restrain Defendant because Defendant was not physically aggressive towards officers at that point. [11:31:34-11:31:43]. Turner did not initially frisk Defendant for weapons. [11:32:12-11:32:16]. Dispatch

reported that Defendant had no warrants, no prior criminal convictions, and a suspended operator's license. [12:22:06-12:22:55].

Defendant told Turner he was upset because his shoes were in the car and the car was locked and because Hoover would not give him a ride back to the residence. [11:32:30-11:32:38, 12:07:7-12:07:19]. Defendant told Turner he lived with Hoover at her house. [12:16:14-12:16:22]. Defendant told Turner he wanted his stuff, and he had thought he would have to "break her fucking window" to get in. [11:34:14-11:34:38; 11:48:30-11:48:51; 12:14:26-12:14:55].[9] Turner responded by discouraging Defendant from doing so. [11:48:51-11:49:02]. Turner was not concerned about Defendant's property; he was focused on the domestic disturbance nature of the call. [12:07:36-12:12:08:46]. Officers began asking Defendant about whether he could theoretically get a ride to his family home because officers wanted to possibly separate Hoover and Defendant as officers viewed this as a domestic disturbance. [12:11:20-12:11:37, 12:11:37-12:11:49]. Turner was concerned about releasing Defendant to return to his motel room, due to the fact Defendant and Hoover were in side-by-side motel rooms, and concerns about the risk of a physical altercation between the two once officers left the scene. [12:12:22-12:12:39, 12:13:09-12:13:18, 12:13:41-12:13:48]. Defendant told Turner he would call his mom who lived in Elkins, and she could come get him. [11:32:51-11:32:55; 11:33:05-11:33:13]. Turner testified that, during next hour and a half officers were at the Super 8 Motel, a ride never showed up for Defendant. [11:32:56-11:33:04]. Defendant remained on the phone almost half the time officers were there investigating, approximately 45 minutes or an hour. [11:33:15-11:33:30].

Turner testified that Hoover was initially hesitant about opening the car because of Defendant's banging on her motel door and window and being upset. [12:24:10-12:24:21]. As

---

[9] See Government's Exhibit Number 1, Turner Cruiser Camera Audio.

soon as Hoover emerged from her motel room and unlocked her car, Defendant got his items from her car. [11:33:31-11:33:51, 12:19:10-12:19:24]. Defendant started to argue with Hoover, blaming her for what was happening. [11:33:51-11:34:00, and 11:53:32-11:54:10]. Defendant again became very upset and aggressive; Turner put himself between the Defendant and Hoover as to separate them and to get Defendant to back away. [11:34:01-11:34:13, 11:53:32-11:54:10, 12:05:55-12:06:15].[10] Turner ordered and directed Defendant to move approximately five to six feet back away from Hoover. [12:06:15-12:06:44]. Defendant stated "I'll see you at the house"; these statements were concerning to Turner, who feared further physical altercations between Defendant and Hoover. [12:14:16-12:14:25, 12:15:32-12:15:54]. Officers later found half of a brick under the car. [11:34:40-11:34:45].

After the situation calmed down, Defendant wanted to put his hands in his pockets. Turner wanted to perform a pat-down Terry Frisk search on Defendant to ensure there were no hidden weapons. [11:57:11-11:57:19].[11] Turner did not have reason to believe Defendant was armed and dangerous but performed the Terry frisk of Defendant for officer safety. [12:20:02-12:20:30]. Turner testified that he pats everyone down everyone he encounters during a disturbance call for the purposes of officer safety. [12:20:31-12:21:05]. Turner searched Defendant down to his waist and pockets, but no farther down his legs. [11:35:38-11:36:09]. Turner did not observe the cash concealed in Defendant's sock and was surprised to learn later that he had missed the cash on this initial search. [11:36:12-11:36:30]. Turner remained concerned about a physical altercation arising between Hoover and Defendant because of Defendant's statements such as "I'll see you at home." [11:37:00-11:37:10].

---

[10] See Government's Exhibit Number 1, Turner Cruiser Camera Audio.
[11] See Government's Exhibit Number 1, Turner Cruiser Camera Audio.

Lantz got permission to search Hoover's car after officers smelled marijuana upon opening the vehicle. [11:35:07-11:35:16]. Officers searched the trunk first while Lieutenant Petroski searched the front of the vehicle. [11:35:17-11:35:22]. Turner participated in the search of the car, [12:18-30-12:18:34]. Defendant was detained and directed to stand on the sidewalk under the awning outside his motel room during the search. [12:18:34-12:18:50]. Turner escorted Defendant under the awning after it began to rain. [12:19:41-12:19:47]. A marijuana paraphernalia device was found in the car. [11:35:23-26]. At the same time, Lantz performed a search of the Defendant and found the cash; Turner did not observe this interaction because he was searching the car. [12:21:20-12:21:26].

Lieutenant Petroski explained to Defendant the charges he was going to be arrested for. [11:58:15-11:58:31]. Petroski explained Defendant would be charged with Possession with Intent to Deliver and Contributing to the Delinquency of a Minor. [11:58:32-11:58:59]. Then, Turner arrested Defendant and placed handcuffs on him. [11:37:34-11:37:51]. Defendant was transported back to the station. [11:37:52-11:38:03].

## D. Testimony of Sergeant Sayers

According to his testimony at the suppression hearing, Sergeant Christopher Bart Sayers ("Sayers") has worked as a police officer for the Bridgeport Police Department for twelve years. [12:34:25-12:34:43].

Sayers was on patrol on January 4, 2020 when the 911 center dispatched him to a disturbance call at the Super 8 Motel. [12:34:43-12:35:11]. The dispatchers relayed that this was a disturbance-type call and that there was a male banging on the door of a motel room. [12:35:39-12:35:49; 1:05:24-1:05:46]. Specifically, according to the CAD Report, dispatch told the officers that the caller's friend, Terrell Anderson is banging on the door and she wants him to leave.

[1:05:47-1:06:36].[12]  Dispatch also reported at 10:38 AM that he was mad because she won't give him a ride home. [1:06:45-1:07:11].

Because it was a disturbance call, there were two officers needed at a minimum. [1:04:46-1:05:09]. Sayers heard officer Lantz say he was responding to the scene. [1:05:10-1:05:18]. It took five to six minutes for Sayers to arrive at the Super 8 motel; he arrived on scene at 10:45. [12:35:50-12:35:56; 1:07:12-1:07:18].

When Sayers arrived, he discovered Officer Lantz had already arrived on scene, and Sayers observed a male who he believed to be the male suspect described in the 911 call. [12:36:00-12:36:20; 1:08:15-1:08:23]. Sayers parked on the backside of the motel in the corner, facing the main road. [12:36:41-12:36:51]. Sayers's police cruiser has a camera on the dashboard which recorded video of what happened in the parking lot that day. [12:43:45-12:44:25].[13] Sayers was the third vehicle on the scene, arriving directly after Officer Turner. [12:36:30-12:36:40; 1:04:27-1:04:45]. When Turner and Sayers approached, the male was on his phone, walking around, and appeared agitated. [12:36:21-12:36:29].  Even though he was agitated, the male, the Defendant, was not violent, and he remained on scene as directed, talked with officers about the situation, and complied with officers when they asked for his personal identifiers. [1:08:50-1:09:10]. Defendant Anderson explained he didn't have his property, and he wanted his property back. [1:09:10-1:09:29].

Sayers realized there were multiple motel rooms involved in the domestic disturbance, and he went to further investigate who else was involved. [12:36:52-12:37:10]. Sayers was aiming to find out what was happening and to resolve the situation. [1:09:29-1:09:42]. Sayers made contact with Hoover and Vaughn in their motel room. [12:37:11-12:37:23]. Lantz was with Sayers at this

---

[12] See Government's Exhibit 5, CAD Incident Report. [ECF No. 31-2].
[13] See Government's Exhibit 3, Video Footage from Sgt. Sayer's Dashboard Camera.

time. [12:37:23-12:37:32]. Hoover and Vaughn informed Sayers that they had called because the Defendant was upset about needing to get some items out of Hoover's car and because Hoover was not going to give him a ride. [12:37:33-12:37:47].

Officers facilitated Hoover getting her keys, opening her car, and allowing Defendant to safely retrieve his items. [1:09:43-1:10:27]. Turner continued to speak with Defendant, while Burgess stayed nearby to observe and supervise Turner, who was his trainee. [1:10:28-1:10:48]. Lantz was also nearby. Defendant was essentially surrounded by the officers and their police vehicles in the parking lot.  [1:10:49-1:11:26]. The original disturbance was over, but Defendant was not permitted to leave. [1:11:27-1:13:03]. Officers wanted him to stay on premises until a ride could come for the Defendant and take him elsewhere. [1:26:31-1:26:38; 1:29:06-1:29:30]. Officers wanted Hoover and Defendant to be separated for safety reasons. [1:34:24-1:32:02]. Defendant was on his phone calling his mother throughout the morning in an attempt to find a ride home. [1:27:40-1:28:22]. A ride never arrived for Mr. Anderson. [1:32:02-1:32:09].

Next, a member of the motel staff came up to Sayers and stated that there was a girl sitting in the motel breezeway who had bags and who was "just sitting there." [12:37:48-12:38:22; 1:13:04-1:13:51]. Sayers wanted to find out who the girl was and see if she was involved in the situation. [12:38:23-12:38:31]. Sayers, alone, approached the girl. [12:38:31-12:38:39; 1:15:52-1:14:01]. The girl was sitting in the breezeway in the middle of the motel. She had a large backpack, a small backpack, and a Bluetooth speaker with her. [12:38:40-12:39:07]. Sayers determined that one of the backpacks, a black backpack, did not belong to the girl, but instead, belonged to the Defendant. [12:39:08-12:39:20].

Sayers thought the girl looked young and he asked her why she was sitting in the breezeway by herself and what was she doing there. [12:39:40-12:39:50]. The girl explained that she was

there just holding the Defendant's bag. [12:39:51-12:39:56]. She stated that he gave it to her to hold. [12:38:57-12:40:01]. She also explained that she had stayed at the motel with the Defendant the night before. [1:14:17-1:14:30]. Sayers's believes his initial interaction with the girl happened before or simultaneous to other officers searching Hoover's car. [1:14:01-1:14:16; 1:14:47-1:15:09].

After a few minutes of speaking with the girl, Sayers motioned for Lantz to assist. [1:14:31-1:14:46]. Sayers motioned for Lantz because he believed he smelled marijuana coming from the girl, and Lantz is an interdiction specialist who is trained specifically to handle drug investigations. [1:15:50-1:16:38]. Both officers then observed an odor of marijuana coming from the girl's body; Lantz asked the girl if she had any marijuana on her. [12:40:02-12:40:28; 1:15:10-1:15:49]. The girl admitted she had marijuana on her. [1:16:39-1:16:48]. The girl immediately removed the marijuana and provided it to the officers. [1:17:27-1:17:36]. She stated she didn't want to get in trouble and that the marijuana wasn't hers. [1:18:53-1:19:09]. She told the officers that the Defendant had given her the marijuana. [12:40:29-12:40:40; 1:17:36-1:17:41; 1:18:19-1:18:30]. Sayers had never met the girl before; there was no way for him to be certain what she was telling officers was telling the truth, except to continue their investigation. [1:19:10-1:19:58]. Lantz took the marijuana to his police cruiser while Sayers helped the girl gather her items from the breezeway. [1:19:59-1:20:18].

Lantz then proceeded to interview Hoover. [1:25:24-1:25:33]. Hoover told Lantz that Defendant sold marijuana to her and her family. This corroborated some of what the juvenile had told officers. [1:25:34-1:25:47].

Sayers and the girl moved from the breezeway to his police car for a fuller interview. [12:40:41-12:40:57; 1:18:31-1:18:48; 1:20:19-1:20:21]. The girl provided Sayers with her

identifying information, and Sayers interviewed her. [12:40:58-12:41:12]. There was a video recording of the Sayers interview with the girl who sat in the back seat of his police car. [12:41:13-12:41:20; 1:18:48-1:18:53].[14] Sayers and the girl spoke for a long time, while the girl wrote her written statement. [12:41:21-12:41:27]. The girl also put down her identifying information on the written statement, such as her name, phone number, and address, so that officers could have followed-up with her if there were further questions. [12:41:28-12:41:44]. In her written statement and in verbal statements, the girl explained that Defendant sells marijuana. [12:41:45-12:42:05]. The girl also wrote that the Defendant always has money and he "flaunts his money." [12:42:06-12:42:22].

Officers called the girl's family members in order to secure her a ride home. Her grandfather, who is her legal custodian, came to the Super 8 Motel. [12:43:02-12:43:30]. Lantz and Sayers spoke to the girl's grandfather when he arrived, and she was released into his custody. [1:20:30-1:20:47].

After over an hour, Defendant was ultimately placed into custody, under arrest. [12:42:23-12:42:38]. Sayers testified on cross-examination that he was not present for the seizure of Defendant's cash or discussions between officers and Defendant regarding the cash seized and what Defendant was being charged with. [1:20:58-1:22:14]. Sayers believed the cash seized corroborated the girl's statements about getting drugs from the Defendant, and the cash served as a basis for charging the Defendant with the specific crimes Defendant was charged with. [1:22:14-1:23:03]. Defendant was placed into Sayer's police vehicle for transportation. [12:42:39-12:42:45]. Sayers transported Defendant from the Super 8 Motel to the Bridgeport Police Department. [12:42:46-12:42:52; 1:20:48-1:20:57].

---

[14] As directed, this video was provided to the Court on a USB thumb drive after the hearing.

### E.  Testimony of Defendant

According to the testimony of the Defendant Terrell Anderson, ("Defendant"), at the suppression hearing,[15] on January 4, 2020, when the first police officer arrived at the Super 8 Motel, Defendant was outside waiting for Hoover as he had been trying to get his stuff. Defendant had been waiting outside for thirty or forty minutes. [1:51:00-1:51:34; 1:51:41-1:51:47]. Defendant was upset. [1:51:48-1:51:56]. Defendant felt relieved when he saw the first officer arrive because he felt, with the assistance, he would be able to retrieve his items and leave. [1:51:35-1:51:40].

Because Defendant was upset, he had difficulties explaining the situation to the officer as well as he'd like, but he believed the officer quickly came to understand the situation. [1:51:57-1:52:19; 1:52:52-1:53:07]. Defendant told the officer that he had been standing outside for a while now; he stated just wanted his stuff and Hoover could just push a button and unlock the car door. [1:51:20-1:52:27].

Defendant and Hoover were roommates. They had plans for that morning for Defendant would go to work at 11:00 a.m. while Hoover went to look at a possible apartment for the two of them to move into. According to the Defendant, the cash that he was carrying that day was money that Hoover and Defendant had saved up for this new apartment. [1:52:27-1:52:43]. Defendant testified that Hoover knew that if Defendant didn't show up to work, that Defendant would get fired. [1:52:44-1:52:51].

When other officers arrived on scene, in marked police cars, in uniform with weapons, and began also asking him questions, Defendant did not think he would be able to leave. [1:53:08-

---

[15] Defendant conferred with counsel prior to testifying and was also repeatedly advised by the Court of his constitutional rights, including his right to remain silent. [1:33:00-1:34:03; 1:49:20-1:49:43; 1:50:00-1:50:45].

1:53:54]. Defendant asked one of the officers, "once I get my stuff, I can just leave, right?" [1:53:55-1:54:08]. Defendant was on the phone with his mother at this time, and she advised that he get a motel room for another night, especially considering Hoover would be leaving the motel shortly. [1:54:09-1:54:25]. Defendant believed he was going to be held by officers, and even if he found a ride, he would not be allowed to leave. [1:54:26-1:54:30].

Defendant was eventually allowed to get his items from Hoover's vehicle. [1:54:34-1:54:42]. After Defendant got his bags from Defendant's car, Hoover came out of the room and spoke to Defendant. She said she was still not willing to give him a ride and suggested he had other people who could give him a ride like his mother. [1:54:43-1:55:08]. Defendant was upset with Hoover because he believed he was going to lose his job due to missing work that morning. [1:55:09-1:55:13]. Defendant testified that he loves Hoover, and he would not threaten her even when upset. [1:55:14-1:55:29].

Defendant has never been convicted for a crime of violence. [1:55:30-1:55:32]. Defendant admitted in testimony that he has had traffic stop encounters with police and believes he has been arrested for possession of marijuana, but he believes that those charges were dismissed, and he doesn't have any convictions. [1:55:33-1:55:56].

After Defendant got his property from Hoover's car, he thought he maybe he could leave and walk to work, but he was not allowed to leave. [1:55:57-1:56:18]. Officer Turner was standing next to Defendant in the street. [1:56:19-1:56:30]. Defendant asked Officer Turner a couple times if he could leave, and he was told he had to stay. [1:56:31-1:56:50]. Next, Turner began to search Hoover's car, and Turner told Defendant to go stand by the motel room doors under the awning, near Hoover and Vaughn. Defendant did as he was told and stood by the motel rooms. [1:56:50-1:57:20]. Defendant stood in this area for some time and engaged in pleasant conversation,

laughing and talking, with the others while he waited since he couldn't leave. [1:57:21-1:57:36]. Hoover left to speak with an officer and when she returned, she began gathering up her items like she was about to leave. [1:57:40-1:57:50].

An officer performed a full body search on Defendant earlier behind Hoover's car and near the police vehicle. [1:57:51-1:58:08]. Defendant thought he had been cleared after the first search. [1:58:09-1:58:12].

Defendant was sitting under the awning and in front of Hoover's car, when Officer Lantz stopped in front of the Defendant and said, "what's that in your sock?" [1:58:19-1:58:33]. Defendant responded that it was cash. [1:58:34-1:58:36]. Defendant believed there would be no problem with having money in his sock. [1:58:37-1:58:40]. Lantz asked Defendant if he had been searched; Defendant responded that he had. [1:58:41-1:58:46]. Lantz walked over to the Defendant, told the Defendant not to move and to keep his hands to his side, reached down and lifted Defendant's pant leg up, and grabbed the money from Defendant's sock. [1:58:47-1:58:59]. Lantz looked at the money, counted it, set it aside, and told Defendant not to touch the money. [1:59:02-1:59:13]. Defendant was still detained at this time. [1:59:13-1:59:15]. Lantz then walked over to the other officers whom he chatted with for some time. [1:59:15-1:59:31].

Afterwards, Defendants was told he was going to be arrested for distribution and for giving a substance to a minor. [1:59:32-1:59:46]. Defendant was arrested and transported to the police department. [2:00:50-2:00:54].

On cross-examination, Defendant testified that when they picked up ANH, he was concerned that ANH had been kicked out of her boyfriend's house and she was out in the rain. Defendant testified that he knows what it feels like to be stuck out in the rain and he didn't want to leave ANH, a friend, in that situation. [2:03:43-2:03:55]. Defendant asked Hoover to decide if

they would go pick up ANH; Hoover was driving so it was her decision. Hoover responded she could not leave a girl outside in the rain like that. [2:01:13-2:01:35; 2:03:20-2:03:42; 2:03:56-2:04:05].

Defendant was planning on going home to go to sleep before work the next morning. However, Hoover changed plans and let Defendant know "last-minute" that they couldn't go back to her house because she had other plans. [2:01:36-2:01:50; 2:04:15-2:04:23].

When questioned on cross-examination about his criminal record, including an August 2016 marijuana possession misdemeanor conviction, Defendant stated he did not remember because it happened so long ago, and it happened at a time when a lot of other things were happening in Defendant's life. [2:04:33-2:05:32]. Defendant had the understanding that those charges were possibly dismissed. [2:05:33-2:05:58]. Defendant reiterated that he couldn't remember what charges were brought against him. [2:05:59-2:06:31].

Defendant stated aside from his arrested, no one grabbed or restrained him during any interactions with police officers on January 4, 2020. [2:06:45-2:07:55].

At some point, Defendant gave up on trying to get a ride home after he realized he would not be able to be let go. [2:08:00-2:08:13]. Defendant told his mom not to worry about getting a ride because he knew he wasn't going anywhere because police had held him there so long, including searching Hoover's car. [2:08:14-2:08:31]. During their telephone conversation, his mom advised him on the telephone to get a room at the Super 8 Motel for another night and then go to work. [2:08:32-2:08:38]. Defendant never told officers he was not getting a ride; Defendant felt officers did not want to hear what he had to say and if he had gotten a ride to come it would not have changed the situation. [2:08:39-2:10:54].

Defendant did not understand why the officers had concerns about a possible escalation of the situation. [2:10:56-2:11:06]. Defendant clarified that he believes any comments about putting a brick through Hoover's window were not threats; Defendant believes he said "what, do I have to put a brick through your window or somethin'?" [2:11:06-2:12:08].

Defendant stated that the cash on him, approximately $3,000, was money he and Hoover saved up for the initial costs of moving into a new apartment. [2:12:21-2:12:55]. Defendant knew that Hoover told officers that some of that money was money Defendant had received from selling drugs. [2:12:55-2:13:05]. Defendant kept his money on him for security reasons, and he didn't think he would have that amount of cash would not be on him long, so he wasn't concerned about it. [2:13:30-2:13:55]. The plan was originally for Defendant to go to work and for Hoover to go meet with the landlord about the prospective apartment, but Hoover changed her mind and changed her plans for that day. [2:14:00-2:15:05; 2:15:11-2:15:22]. Defendant explained he and Hoover had saved up for months for that money. [2:15:06-2:15:10]. Defendant testified that that money was not from street-level drug sales. He testified that his family and Hoover's family helped and contributed some of the money, in addition to the money Defendant received from his job at the shoe store. [2:15:23-2:16:40].

## IV. LEGAL ISSUES AND ANALYSIS

As a threshold matter, the undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, the burden of proof for a motion to suppress is on the party seeking to suppress the evidence. United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981).

### A. Reasonable Suspicion for Detention and Search

#### 1) Initial Detention

Defendant argues that the officers lacked the necessary reasonable suspicion to detain the Defendant. Defendant argues he was lawfully present at the motel, he did not threaten to harm Hoover, there was no criminal conduct alleged during the 911 call, and no other guests at the motel complained about Defendant's behavior.

The Government argues in their Response that the encounter between Defendant and officers began as a consensual one, with officers responding to the scene to assess the situation and help all parties with the domestic disturbance, including retrieving Defendant's items from Hoover's car. The Government further argues that officers would have been justified in detaining Defendant once they gained information about Defendant's threatening comments towards Hoover, after retrieving evidence of Defendant's plausible drug trafficking, or once they gained knowledge that Defendant had spent the night in a hotel with a fifteen-year-old girl.

Instructive caselaw provides that a brief investigative detention of a suspect is permissible under the Fourth Amendment where an officer observes "unusual conduct" which provides him or her with reasonable, articulable suspicion that criminal activity is afoot. Terry v. Ohio, 392 U.S. 1, 30 (1968). To determine whether an investigative detention, or seizure, was unreasonable, the court must first consider whether "the officer's action was justified at its inception," Id. at 20.

Accordingly, a court is to review the Terry stop "from the standpoint of an objectively reasonable police officer." Ornelas v. United States, 517 U.S. 690, 696 (1996). The Fourth Circuit has articulated: "The reasonable suspicion standard, like the probable cause standard, is a fluid concept which takes its substantive content from the particular context in which the standard is being assessed." United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004) (citation omitted).

Moreover, "because the <u>Terry</u> reasonable suspicion standard is a commonsensical proposition, '[c]ourts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." <u>Id</u>. at 782 (quoting <u>United States v. Lender</u>, 985 F.2d 151, 154 (4th Cir. 1993)). <u>See also</u> <u>United States v. Williams</u>, 808 F.3d 238, 246 (4th Cir. 2015) ("Reasonable suspicion is a 'commonsense, nontechnical' standard that relies on the judgment of experienced law enforcement officers, 'not legal technicians.'") It is a "totality of the circumstances" determination. <u>United States v. Crittendon</u>, 883 F.2d 326, 328 (4th Cir. 1989); <u>United States v. Arvizu</u>, 534, U.S. 266, 273 (2002) (reaffirming "totality of the circumstances" test).

However, an officer cannot make such a stop based on a mere hunch. <u>See</u> <u>United States v. Arvizu</u>, 534 U.S. 266, 274 (2002).  Indeed, the Fourth Circuit has cautioned that the Government "cannot simply proffer 'whatever facts are present, no matter how innocent, as indicia of suspicious activity.'" <u>United States v. Massenburg</u>, 654 F.3d 480, 489 (4th Cir. 2011) (quoting <u>United States v. Foster</u>, 634 F.3d 243, 248 (4th Cir. 2011)). The Government "'must do more than simply label a behavior as 'suspicious' to make it so'; rather, the [G]overnment must be able to 'articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance.'" <u>Slocum</u>, 804 F.3d at 684 (quoting <u>Massenburg</u>, 654 F.3d at 491).

Again, "[t]o justify a stop, the officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion" of an investigative detention. <u>United States v. Slocum</u>, 804 F.3d 677, 682 (4th Cir. 2015) (citations and quotations omitted).

Also, well-established is the exclusionary rule – that a court should exclude evidence obtained by dint of law enforcement's unlawful arrest or search. See Mapp v. Ohio, 367 U.S. 643 (1961). Relatedly, however, a court should suppress evidence in a criminal matter "only … where its deterrence benefits of exclusion outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

Here, officers were able to provide specific and articulable facts, which when considered in the timeline of events on January 4, 2020, reasonably warranted the Defendant's investigative detention. Officers Lantz, Turner, and Sayers all testified that the Defendant's initial detention was based upon (1) the information provided by the 911 dispatcher that there was a man was banging on the door of a motel room and the caller(s) wanted him to leave and (2) the unknown volatility of the situation upon arrival. There is no dispute that Defendant was visibly upset when officers arrived at the scene of the disturbance call. Defendant quickly explained to officers that he and Hoover lived together, and Defendant, according to his own testimony, made statements to officers expressing his immense agitation and reiterating his prior statements to Hoover – ""what, do I have to put a brick through your window or somethin'?"

Additionally, the undersigned would note, at the beginning of the encounter, Defendant consented to remaining on the scene while officers investigated. As articulated in his testimony, Defendant was relieved when officers arrived because he wanted to retrieve his items from Hoover's car. Defendant had a vested interest, at least initially, in remaining on scene while officers interviewed Hoover and attempted to deescalate the situation. In addition, Hoover independently corroborated that the Defendant was beating on her door and requesting his items because his shoes were in her car and she refused to come outside. The officers would have been

justified in an investigative detention from the beginning; however, it is clear that some of the time spent answering the officer's questions upon their arrival was not a wholly unwanted intrusion.

An objectively reasonable police officer could have concluded, based on experience, that more sinister criminal activity, such as domestic violence, harassment, or assault, was afoot. As described in their testimony, this exact suspicion lead to investigative detention of Defendant by the officers on January 4, 2020. Supported by reasonable, articulable suspicion, an investigative detention of the Defendant was justified at its inception. Furthermore, a Defendant consented to a portion of the time spent with officers on the morning of January 4, 2020 because he wanted officers to assist in retrieving his belonging.

### 2) Continued Detention

Under Terry's "dual inquiry," after asking whether the officer's action was justified at its inception, the Court must ask whether the continued stop was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure. United States v. Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011)(internal quotations and citations removed).

The mission of the Terry stop determines how long the stop can last. See Rodriguez v. United States, 575 U.S. 348, 354, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015) (noting that "the tolerable duration of police inquiries in the [Terry] context is determined by the seizure's 'mission' "); Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ("The scope of the detention must be carefully tailored to its underlying justification."). The police must "diligently pursue their investigation" and must not "unnecessarily prolong[ ]" the stop. United States v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (emphasis omitted) (quoting United States v. Place, 462 U.S. 696, 709, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983)). "Authority for the seizure thus ends when tasks tied to the [investigation] are—or reasonably should have been—

36

completed." Rodriguez, 575 U.S. at 354, 135 S.Ct. 1609. See also Illinois v. Caballes, 543 U.S. 405, 408 (2005) (citing United States v. Jacobsen, 466 U.S. 109, 124 (1984)) and United States v. Place, 462 U.S. 696 (1983) (holding ninety-minute Terry investigative detention of traveler's luggage was unreasonably prolonged, and the violation was worsened by agent's failure to inform defendant about the details of his property's seizure).

The Fourth Circuit has held that to prolong an investigative detention, an officer "must possess a justification for doing so other than the initial . . . violation that prompted the stop in the first place." Branch, 537 F.3d at 336. This requires either the individual's consent or a "'reasonable suspicion' that illegal activity is afoot." Id.

Specifically, in United States v. Branch, the Fourth Circuit has held that where "reasonable articulable suspicion of narcotics activity" develops during an otherwise lawful traffic stop, the officer's objectively reasonable suspicion of narcotics trafficking may justify a continued detention. United States v. Branch, 537 F.3d 328, 339 (4th Cir. 2008). Again, "in order to assess whether reasonable suspicion is present, we look at the 'totality of the circumstances' and the officer must demonstrate a 'particularized and objective basis for suspecting legal wrongdoing.'" United States v. Bernard, 927 F.3d 799, 805 (4th Cir. 2019) (citing United States v. Vaughan, 700 F.3d 705, 710 (4th Cir. 2012)). The reasonable duration of a stop cannot be determined with mathematical precision. Branch, 537 F.3d at 336.

Here, the stop of Defendant was justified at its inception and, as articulated above, Defendant freely spent some time with officers explaining the situation and asking for assistance in retrieving his shoes.

Furthermore, the Defendant's prolonged investigative detention was justified as the officers subsequently developed reasonable articulable suspicion of narcotics activity. As officers

were working to resolve the domestic disturbance between Defendant and Hoover, Hoover's car was opened so Defendant could retrieve his items from the car and the smell of marijuana was observed. Simultaneously, while officers were searching Hoover's car, officers became aware of the juvenile ANH in the hallway, and ANH quickly supplied the officers with marijuana and stated Defendant had provided it to her. Defendant continued to be detained as the officers now had reasonable articulable suspicion that distribution of controlled substances to a minor and narcotics trafficking had recently occurred. The officers did not offend the Fourth Amendment as they worked to pursue information regarding those criminal offenses.

The Defendant was detained for approximately one hour while officers investigated the domestic disturbance, searched Hoover's car, interviewed ANH, and interviewed Hoover. While this time period may be longer than what may be expected for officers to diffuse a typical domestic disturbance, like in Branch, Defendant's stop was prolonged because there was reasonable suspicion that illegal narcotics activity was afoot. Officers reasonably extended the stop to perform the tasks necessary to investigate the possible drug trafficking. They extended the Defendant's detention only in order to search the vehicle and to interview the two witnesses on scene before they were released. These actions by officers which extended the detention were directly related to the mission of investigating their reasonable articulable suspicion of drug trafficking activities.

The undersigned is of the opinion that, under these specific circumstances, the officers worked diligently to investigate the initial reports of a domestic disturbance, and then, as the situation evolved, officers worked diligently to investigate their reasonable articulable suspicion of narcotics trafficking and child endangerment. There was justification to prolong the Defendant's investigative seizure.

### 3) Search During Investigative Detention

Defendant asserts that, even if there was reasonable suspicion to detain Mr. Anderson, "the cash must be suppressed because it was seized from Mr. Anderson's sock without a warrant and without Mr. Anderson's consent." [ECF No. 21 at 8]. Defendant's Motion concludes the seizure of the cash was "patently illegal" Fourth Amendment violation as the cash was taken while Defendant was "detained, without his consent, without a warrant, and prior to any pat down for weapons." [ECF No. 21]. The Government argues that the cash would have inevitably been discovered as part of Defendant's search incident to arrest.

Generally, "[a]n officer may conduct a patdown search of the detainee's outer clothing if there is "reason to believe that he is dealing with an armed and dangerous individual." United States v. Clapp, 181 F.3d 92 (4th Cir. 1999) (citing Terry v. Ohio, 392 U.S. 1, 27 (1968)). The scope of a Terry search is limited to a protective search for weapons.

A suspicious bulge under a suspect's clothing may provide a basis for a protective search. Adams v. Williams, 407 U.S. 143, 146 (1972) ("The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence."). Clapp, 181 F.3d at 92 (citing United States v. Baker, 78 F.3d 135, 137 (4th Cir.1996)). For example, in Pennsylvania v. Mimms, the Supreme Court of the United States upheld the search of an automobile driver based upon a bulge observed in the driver's jacket. The Supreme Court explained that "[t]he bulge in the jacket permitted the officer to conclude that [the suspect] was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of 'reasonably caution' would likely have conducted the 'part down.'" Pennsylvania v. Mimms, 434 U.S. 106, 112 (1977). The only evidence of Mimms's dangerousness was the bulge indicating that he may be armed.

In <u>United States v. Baker</u>, the United States Court of Appeals for the Fourth Circuit, following <u>Mimms</u>, held that "observing a bulge that could be made by a weapon in a suspect's clothing reasonably warrants a belief that the suspect is potentially dangerous, even if the suspect was stopped only for a minor violation." <u>United States v. Baker</u>, 78 F.3d 135 (4th Cir. 1996)(<u>citing Mimms</u>, 434 U.S. at 112). The Fourth Circuit instructed that "[d]etermining the reasonableness of a protective search involves balancing the officer's interest in self-protection against the intrusion on individual rights necessitated by the search." <u>Baker</u>, 78 F.3d at 137. Furthermore, the court provided that protective searches are not limited to a "pat down" search method; protective searches may permissibly conducted in other ways as to limit intrusion and remain within the boundaries established by Terry. <u>Id</u>. For example, other courts have held that an officer may reasonably lift a suspect's clothing to identify the source of a bulge, <u>United States v. Hill</u>, 545 F.2d 1191, 1193 (9th Cir.1976) (per curiam), or even reach directly in the waistband of suspect's pants where an officer believes a gun to be hidden, <u>Adams v. Williams</u>, 407 U.S. 143, 148 (1972). Ultimately, in <u>Baker</u>, "based on a balancing of the necessity for the search against the intrusion caused by the search, directing that [the detainee] raise his shirt constituted a reasonable search limited to discovering whether he was carrying a concealed weapon." <u>Id</u>.

Here, the details are not entirely clear as to Lantz's subjective motivations for performing the search of Defendant. Lantz was unable to remember his exact method of searching the Defendant or how the cash was retrieved. Hoover and Defendant both testified about the interaction from their vantage points.

Hoover overhead an interaction between officers, her guest Vaughn, and Defendant but did not see the cash being removed from Defendant's sock because of where she was standing in the motel's walkway. According to her testimony, Hoover overheard one officer ask another if

Defendant had already been searched. She testified that she heard Vaughn indicated to officers that Defendant had "barely" been searched.

The undersigned would note that Officer Turner, the trainee officer who was taking lead (with supervision) as the responding officer, had performed an earlier pat down search of the Defendant down to his waist and pockets, but no farther down his legs. Turner did not observe the cash concealed in Defendant's sock during this initial search. Turner testified he did not believe Defendant to be armed and dangerous but performed the pat down as a customary precaution for officer safety.

Defendant testified that when asked about the bulge near his socks by Officer Lantz, Defendant told Lantz that the bulge in his sock was cash and that he had already been searched. Lantz testified that he could not recall whether Defendant retrieved the cash from Defendant's sock or whether Defendant handed him the cash. Lantz did not memorialize this search on an evidence form or as part of the affidavit for the subsequent search warrant. According to Defendant's testimony, Lantz told the Defendant not to move and to keep his hands to his side, then Lantz reached down and lifted Defendant's pant leg up and grabbed the wad of cash from Defendant's sock.

When balancing the necessity for the search with the intrusion upon the Defendant, the lifting of a pant leg to inspect and retrieve a suspicious bundle constitutes a reasonable search limited to confirming the contents of the unknown bulge. In that moment, Officer Lantz had no more than the Defendant's word to rely upon that the bulge near Defendant's ankle was a wad of cash and not a concealed weapon. The undersigned recognizes that, due to Officer Lantz's failure to memorialize his actions in performing the search, there are limited facts to analyze the exact nature of the search. However, the undersigned believes that after hearing a witness state the

Defendant had "barely" been search before, knowing the trainee officer had been handling the Defendant prior, and now observing a suspicious bulge at Defendant's ankle, any officer of reasonable caution would have performed a protective search.

Regardless, even if the search of Defendant by Lantz which yielding the cash is found to be unreasonable, it can be established by a preponderance of the evidence that law enforcement would have inevitably been discovered by lawful means during Defendant's search incident to arrest.

The "Fourth Amendment's exclusionary rule normally prevents the government from using evidence obtained as a result of an illegal search against the victim of that search." United States v. Bullette, 854 F.3d 261, 265 (4th Cir. 2017)(citing Utah v. Strieff, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016)). However, the exclusionary rule is subject to the inevitable-discovery exception which "allows the government to use information obtained from an otherwise unreasonable search if it can establish by a preponderance of the evidence that law enforcement would have 'ultimately or inevitably' discovered the evidence by 'lawful means.'" Id. (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)). "Lawful means" include an inevitable search falling within an exception to the warrant requirement that would have inevitably uncovered the evidence in question. Bullette, 854 F.3d at 265 (4th Cir. 2017) (citing United States v. Allen, 159 F.3d 832, 841 (4th Cir. 1998)). See also United States v. Allen, 159 F.3d 832, 841 (4th Cir. 1998); United States v. Cotnam, 88 F.3d 487 (7th Cir. 1996) (evidence was going to be inevitably discovered pursuant to a search incident to arrest); and United States v. Rodriguez, 750 F. Supp. 1272 (W.D.N.C. 1990) (inevitable discovery rule applies when officers searched a defendant pursuant to arrest after officer reached in pocket specifically to obtain bag of cocaine).

"Whether law enforcement would have inevitably discovered the evidence by lawful means is a question of fact[.]" <u>Bullette</u>, 854 F.3d at 265.

Lantz testified that, in his opinion, the cash would have inevitably been found as part of a search incident to arrest, regardless of which charge Defendant was charged with  He testified that regardless of the cash, there was enough evidence to support probable cause to charge and arrest Defendant for Contributing to the Delinquency of a Minor. The undersigned agrees. At the time Defendant was searched by Lantz, Lantz and Sayers had already spoken with the fifteen-year-old female, ANH, who provided officers with the marijuana supplied to her by Defendant and explained she had spent the evening at the motel with Defendant. Had Lantz not seized the cash from Defendant's ankle bulge, officers nevertheless would have ultimately arrested and searched Defendant on the misdemeanor charge of Contributing to the Delinquency of a Minor.

Moreover, at the time of the Defendant's search by Lantz, there was already sufficient probable cause for an arrest on the charge of Possession with Intent to Distribute Marijuana. ANH provided both oral and written statements to Sgt. Sayers that the Defendant gave the marijuana to her. ANH stated she had knowledge that he sells marijuana, and this was his marijuana. Officers found her credible and ANH's personal knowledge of the Defendant was corroborated by the fact that she was in possession of his other belongings including his backpack with his ID. Lantz had not yet interviewed Hoover in full. While Lantz's seizure of the cash as well as his interview with Hoover contributed to probable cause determination for both Defendant's arrest and the subsequent search warrant, the facts of this case support that, regardless of the initial seizure of the cash by Officer Lantz, the cash would have eventually been seized upon Defendant's search-incident-to-arrest for the charges of Possession with Intent to Distribute Marijuana and/or Contributing to the Delinquency of a Minor.

Thus, the undersigned concludes that, even if the Court were to find the search of the Defendant unreasonable, the inevitable-discovery exception which applies because the Government can establish by a preponderance of the evidence that law enforcement would have inevitably discovered the cash upon Defendant's search incident to arrest.

Accordingly, the undersigned **RECOMMENDS** that the Defendant's Motion to Suppress be **DENIED** as 1) the Defendant's initial investigative stop was supported by reasonable articulable suspicion; 2) the stop was justifiably prolonged based upon reasonable articulable suspicion of drug trafficking and in order for officers to perform reasonable investigative tasks; 3) the search of the Defendant during the investigative detention was permissible under the Fourth Amendment; and 4) even if the search of the Defendant during the investigative detention is found to be unreasonable, the inevitable-discovery exception applies.

## B.  Probable Cause for Arrest

"A warrantless search by the police is invalid unless it falls within one of the narrow and well-delineated exceptions" to the Fourth Amendment's warrant requirement. Flippo v. West Virginia, 528 U.S. 11, 13 (1999) (per curiam). One of these well-delineated exceptions authorizes warrantless searches incident to arrest. See United States v. Robinson, 414 U.S. 218, 224 (1973).

Warrantless arrests – and searches incident thereto – are permitted where there is probable cause to believe a felony is being or has been committed by the arrested individual, based upon "the totality of the circumstances." Illinois v. Gates, 462 U.S. 213, 230-31 (1983). Probable cause requires "facts and circumstances within the officer's knowledge [which] would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." United States v. Manbeck, 744 F.2d 360, 376 (4th Cir. 1984).

"[W]hen law enforcement officers have probable cause to make a lawful custodial arrest, they may -- incident to that arrest and without a warrant – search 'the arrestee's person and the area within his immediate control.'" United States v. Currence, 446 F.3d 554, 556 (4th Cir. 2006) (quoting Chimel v. California, 395 U.S. 752, 763, (1969)). "Such searches have long been considered valid because of the need 'to remove any weapons that the arrestee might seek to use in order to resist arrest or effect his escape' and the need to prevent the concealment or destruction of evidence." New York v. Belton, 453 U.S. 454, 457 (1981) (alteration omitted) (quoting Chimel, 395 U.S. at 763). Nonetheless, "[t]he constitutionality of a search incident to an arrest does not depend on whether there is any indication that the person arrested possesses weapons or evidence. The fact of a lawful arrest, standing alone, authorizes a search." Michigan v. DeFillippo, 443 U.S. 31, 35 (1979).

Possession with Intent to Deliver Marijuana is a felony offense. West Virginia Code §60A-4-401. Contributing to the Delinquency of a minor is a misdemeanor offense, which may include a fine not less than $50 or more than $500, or incarceration for a period not to exceed one year or both. West Virginia Code §61-8D-10.

Here, the facts and circumstances warrant the belief that Defendant had committed a criminal offense. Hoover told Lantz that she and her family frequently purchased marijuana from Defendant and had been doing so for about one year. She was able to specify the amounts he dealt in and the prices charged by the Defendant. She described going to Morgantown with him when he bought larger quantities of marijuana. She described that she last purchased marijuana from the Defendant four days earlier for a cost of $40.00. A marijuana smoking device was found in her car.

ANH told Sayers and Lantz that she, a fifteen-year-old juvenile, had spent the night with the twenty-five-year-old Defendant. She also told officers that Defendant had given her his bag to hold (which she was in possession of and where his ID was eventually found), and she told officers that Defendant had given her the 5.75 grams of marijuana (which she voluntarily surrendered to officers). In her written statement, ANH indicated that Defendant "might sell marijuana," and he "flaunts his money."

Moreover, while its seizure is challenged by Defendant in his motion, Defendant was carrying a large quantity of cash, which was concealed in his sock, and which was initially observed as a "bulge" by police officers. This suspicious bulge, which turned out to be cash, would have reasonably added to the probable cause considerations for the Defendant's arrest. See also United States v. Haye, 825 F.2d 32, 35 (4th Cir. 1987)( "[T]he presence of such a suspicious bulge can provide a trained drug enforcement officer with probable cause to believe that the bulge is a package containing narcotics."); United States v. Aquiar, 825 F.2d 39 (4th Cir.1987)("Whether or not the policeman's observance of the bulge at the ankle alone was enough to constitute probable cause for arrest, we need not decide, but in combination with the drug courier profile characteristics exhibited by [Defendant], it would constitute probable cause for arrest."); and United States v. Lehmann, 798 F.2d 692 (4th Cir.1986).

The Seventh Circuit definitively stated in United States v. Cervantes that "although a wad of cash is not in itself a suspicious object, a wad of cash in the hands of a person who the police have good reason to believe just received it in exchange for a delivery of illegal drugs is suspicious and indeed enough so to give the police probable cause to believe it evidence of criminal activity[.]" United States v. Cervantes, 19 F.3d 1151, 1153 (7th Cir. 1994). See also United States v. L., 384 F. App'x 121, 123 (3d Cir. 2010) ("The incriminating nature of a large amount of cash

may be immediately apparent-thus giving rise to probable cause-where the totality of the circumstances provides some indication that the cash is contraband."). When inventoried, the money discovered on Defendant was primarily in $100 and $20 bills, which Lantz testified that, based on his experience as an interdiction specialist, is indicative of street-level drug sales and added to the probable cause for his arrest.

When viewing the totality of the circumstances, a reasonably prudent person would believe that the Defendant had committed the felony offense of Possession with Intent to Deliver. Defendant's arrest on January 4, 2020 was based upon probable cause. His search incident to arrest, which yielded the Defendant's iPhone, was therefore permissible.

Accordingly, the undersigned **RECOMMENDS** that the Defendant's Motion to Suppress be **DENIED** on the grounds that the arrest was supported by probable cause and the search incident to arrest was therefore constitutional.

### C. Probable Cause for Search Warrant

In order to establish probable cause for the issuance of a search warrant, it must be shown that "given all the circumstances set forth in the affidavit[,] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Legg, 18 F.3d 240, 243 (4th Cir. 1994) (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)).

Probable cause must be established through the information presented to the issuing magistrate. United States v. Wilhelm, 80 F.3d 116, 120 (4th Cir. 1996). Information to be considered is not limited to the written affidavit; the magistrate may also include sworn statements. United States v. Clyburn, 24 F. 3d 613, 617 (4th Cir. 1994).

Probable cause "may be founded upon hearsay and information received from informants." United States v. DeQuasie, 373 F.3d 509, 518 (4th Cir. 2004). Probable cause may even be

established through anonymous tips if they are corroborated. Illinois v. Gates, 462 U.S. 213, 238

(1983). A "totality of the circumstances" test is required for assessing the reliability of an

informant's information. Illinois v. Gates, 462 U.S. 213, 238 (1983); Maryland v. Pringle, 540

U.S. 366, 371 (2003); see also, United States v. Hurwitz, 459 F.3d 463, 473 (4th Cir. 2006); United

States v. Gillenwaters, 890 F.2d 679, 682 (4th Cir. 1989).

A magistrate should consider whether the information was reported during an in-person,

face-to-face interview or via an anonymous tip by other means, such as by telephone. Face-to-face

reports are inherently more trustworthy and reliable because law enforcement can assess the

informant's credibility and demeanor and hold the informant accountable for making false

statements. See United States v. Dequasie, 373 F.3d 509, 518 (4th Cir. 2004), United States v.

Perkins, 363 F. 3d 317, 323 (4th Cir. 2004), and United States v. Christmas, 222 F. 3d 141, 144

(4th Cir. 200). Whereas, if the information relied upon in the affidavit is provided by an anonymous

telephone tip, given by a never-to-be-identified informant whose credibility cannot be accessed,

that search warrant will be found to be insufficient. See United States v. Wilhelm, 80 F.3d 116,

120 (4th Cir. 1996).

The basis of the informant's knowledge is also "highly relevant in determining the value

of an [informant's] report[.]" Gates, 462 U.S. at 230. See also United States v. Hodges,705 F.2d

106, 108 (4th Cir. 1983)(probable cause was based solely on information provided by defendant's

live-in girlfriend who had seen illegal firearm in residence). The Supreme Court has found that an

> explicit and detailed description of alleged wrongdoing, along with a statement that
> the event was observed firsthand, entitles [the] tip to greater weight than might
> otherwise be the case.

Gates, 462 U.S. at 213. See also United States v. Pelham, 801 F.2d 875, 878 (6th Cir.

1986)("[T]here could hardly be more substantial evidence of the existence of the material sought

and its relation to a crime than [an informer's] direct viewing of marijuana in the [defendant's] house."), cert. denied, 479 U.S. 1092 (1987). The extent to which the informant's information is corroborated can also be an important consideration. See United States v. Lalor, 996 F.2d 1578, 1581 (4th Cir. 1993).

The task of the reviewing court is "only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." Massachusetts v. Upton, 466 U.S. 727, 728 (1984). Therefore, the reviewing court does not perform a de novo review, but rather, limits itself to the information that was presented to the magistrate who issued the warrant. Id.

Here, two different witnesses, in *separate* face-to-face interviews with officers, connected the Defendant to marijuana sales.

Hoover told Officer Lantz that the Defendant sold marijuana. The affidavit explains Hoover's basis for this knowledge was from living with Defendant, frequent marijuana purchases by her and her family from the Defendant over the past year, and her experiences accompanying the Defendant to Morgantown to purchase marijuana. The information was detailed, including the date of her last purchase from the Defendant for a total of $40.00.

The affidavit includes that Hoover was mirandized by Lantz and that she provided her name and details about her residence. The affidavit, on its face, indicates that officers had ample opportunity to access Hoover's credibility on January 4, 2020 and consider whether the information she was providing was internally consistent and reliable. There was also information provided which would allow officers to hold Hoover accountable and follow-up with her should any of the information provided be revealed to be false.

The issuing circuit court judge in this case could reasonably have inferred, when considering the totality of the circumstances as articulated in the affidavit alone, that Hoover was a reliable informant. Further, the issuing judge could have reasonably found that the information provided by Hoover as detailed in the affidavit strongly supported the probability that evidence of drug trafficking would be found on Defendant's iPhone.

The female juvenile, ANH, independently provided information based upon her personal interactions with Defendant. The affidavit indicates that while on scene ANH gave face-to-face oral statements to Sgt. Sayers and Officer Lantz. ANH voluntarily surrendered marijuana which she had been concealing on her body. She admitted to officers that she had spent the evening with Defendant and Defendant had told ANH to hold his bag and hide in the breezeway when police were called. The issuing judge could reasonably have inferred, when considering the totality of the circumstances as articulated in the affidavit, that officers found ANH to be a reliable informant. Further, the issuing judge could have reasonably found that the information provided by ANH as detailed in the affidavit strongly supported the probability that evidence of drug trafficking would be found on Defendant's iPhone.

The affidavit explains that the interactions with witnesses Hoover and ANH were on scene, face-to-face on January 4, 2020. [ECF 21-1 at 5-6]. The two witnesses corroborated one another and established a fair probability that Defendant was distributing controlled substances, namely marijuana. The evidence found on scene, including the marijuana retrieved from ANH and Hoover's glass smoking device, could reasonably be viewed by a judge as corroborating the witness' statements.

Regardless of the cash at issue and the issue of the cash's seizure from Defendant's body, there is substantial evidence in the record supporting the circuit court judge's decision to issue a

warrant for search of Defendant's iPhone in order to investigate possible drug distribution transactions. Accordingly, the undersigned **RECOMMENDS** that the Defendant's Motion to Suppress be **DENIED** on the grounds that the search warrant was valid.

### D. Leon Good-Faith Exception

Even if this Court were to find the search warrant invalid, the Leon good faith exception may salvage an otherwise defective warrant. United States v. Leon, 468 U.S. 897 (1984). In United States v. Leon, the Supreme Court held the Fourth Amendment's exclusionary rule does not bar the admission of evidence obtained by officers acting in objectively reasonable reliance on a search warrant which was issued by a detached and neutral magistrate but ultimately found to be invalid. Id. See also United States v. Edwards, 798 F.2d 686, 690 (4th Cir. 1986). "Leon teaches that a court should not suppress the fruits of a search conducted under the authority of a warrant, even a 'subsequently invalidated' warrant, unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" United States v. Bynum, 293 F.3d 192, 195 (4th Cir.2002).

The Fourth Circuit has recognized four situations where the Leon good faith exception does not apply because an officer's reliance on the search warrant would not be reasonable:

1. the magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;

2. the magistrate wholly abandoned his neutral and detached judicial role;

3. the warrant was based upon an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and

4. the warrant was so facially deficient, by failing to particularize the place to be searched or the things to be seized that the executing officers cannot reasonably presume it to be valid.

See United States v. Doyle, 650 F.3d 460, 467 (4th Cir. 2011) (quoting United States v. DeQuasie, 373 F.3d 509, 519-20 (4th Cir. 2004). See also United States v. Hyppolite, 65F.3d 1151, 1156 (4th Cir. 1995); and United States v. Wilhelm, 80 F.3d 116, 121 (4th Cir. 1996).

In other words, "[u]nder the good faith exception, evidence obtained from an invalidated search warrant will be suppressed only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause. United States v. Lalor, 996 F.2d 1278 (4th Cir. 1993).

Here, even if the warrant were to be found lacking in probable cause, the Leon good faith exception applies. Defendant argues, as articulated above, that the $3,120 was illegally seized in violation of his Fourth Amendment rights. Defendant argues that the affiant's failure to disclose the way in which the cash seized amounts to reckless disregard of the truth, and, therefore, makes the affidavit unconstitutionally misleading. The Government argues that the Defendant fails to show that what was written in the affidavit about the Defendant's wad of cash is false, and Defendant has not shown that the money was illegally procured[16] from the Defendant.

There is nothing to suggest that Officer Lantz was dishonest or reckless in preparing his affidavit. The attached affidavit includes four sentences regarding the cash seized:

> Later while speaking with ANDERSON, I observed a bulge in his sock. I asked ANDERSON what was in his sock and he stated it was cash. ANDERSON had a large amount of US currency that was rubber-banded together. ANDERSON had approximately $3,210.00 in US currency primarily in $100 and $20 dollar bill increments.

[ECF No. 21-1]. The exact method by which the cash was seized is not included in the affidavit. The fact that the affidavit was inartfully written or lacked some details does not support

---

[16] As articulated above, the undersigned is of the opinion that the cash was permissibly seized as part of a Terry search during an investigative detention for the purposes of officer safety. Additionally, the undersigned concluded that even if the seizure of the cash was unreasonable, inevitable discovery applies as the cash inevitably would have been discovered upon a search incident to arrest.

Defendant's accusation that affiant Lantz's acted in reckless disregard of the truth. The Court cannot, without any supporting evidence, assume the affiant was acting with the malicious intent to mislead. Based upon the evidence presented to the Court, including the Defendant's own testimony, there are no false statements included in this four-sentence description of the cash seized. A reasonably well-trained officer could have objectively concluded that the seizure of the cash in this case was lawful, that the testimony of the informants provided ample probable cause, and that the short and concise information offered in this affidavit was sufficient for the circuit court judge who did indeed authorize the search warrant. Under the <u>Leon</u> good faith exception, the evidence from the iPhone should not be suppressed, even if the search warrant is found to be invalid, because Officer Lantz was acting in objectively reasonable reliance on the search warrant issued.

## V. CONCLUSION

For all the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Physical Evidence [ECF No. 21] be **DENIED.**

Any party shall have **fourteen days** from the date of filing this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of**

**Appeals.** <u>Snyder v. Ridenour</u>, 889 F.2d 1363 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

**Respectfully submitted April 14, 2021.**

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE